ROSANNA M. MARSHALL

*v.*

F. W. PECK *et al.*

91   187
23a  162

1. WITNESS—*competency—party against heirs.* On bill against the heirs of a deceased person to enforce an agreement claimed to have been made by the deceased in his lifetime with the complainant, the latter is not a competent witness in his own behalf.

2. SAME—*competency—husband for his wife.* On bill by a wife against the heirs of a deceased person to specifically enforce a verbal agreement of the deceased to convey a certain lot to a trustee for use of the complainant, made after the deceased had given a bond for a deed to her husband, and with the assent of the husband at the time, the latter is a competent witness for his wife to prove the agreement to convey to her. If, however, he had assigned his claim merely to render him competent, he would be incompetent by the terms of the seventh section of the act entitled "Evidence and Depositions."

3. SPECIFIC PERFORMANCE—*requires clear proof after great delay.* A decree for the specific performance of an alleged verbal agreement to convey land will not be granted where the bill is not filed until more than ten years after the alleged agreement and after the death of the other party, on slight evidence of the agreement, especially when the conduct and acts of the complainant for many years before are inconsistent with the existence of the right claimed, and such as to lead to the conviction that if the complainant ever had any claim to the relief sought, it must have been settled and adjusted long before.

APPEAL from the Superior Court of Cook county; the Hon. SAMUEL M. MOORE, Judge, presiding.

Mr. B. S. MORRIS, and Mr. JAMES W. BEACH, for the appellant.

Messrs. HUNTER & PAGE, for the appellees.

Mr. JUSTICE WALKER delivered the opinion of the Court:

Appellant claims to be the equitable owner of lot 19 in Springs' subdivision of a quarter of land in Cook county. She alleges in her bill, and claims it to be proven by the evidence, that this lot was purchased under an arrangement by P. F. W. Peck and her husband, that they should purchase real

estate in and near Chicago, Peck furnishing the money, and Marshall making purchases and sales, the profits, after deducting expenses, to be divided; that this property was thus purchased and conveyed to Peck, and held from some time in 1853 till in 1856, and not having been sold, they agreed that Marshall should become the purchaser at $3000, with ten per cent interest, payable in three years. A written contract was executed by Peck for a conveyance on the payment of the money, which is claimed to have been destroyed by the fire in 1871.

It is also claimed, that soon after this arrangement was made the parties thereto, with appellant, further verbally agreed, that on payment of the purchase money, Peck should convey the lot to a trustee to hold for appellant. And to secure the purchase money, she and her husband executed a mortgage to Peck on another piece of ground, subject to several mortgages or trust deeds falling due at different times and aggregating about $4800; that subsequently the trustee named in the trust deed last falling due sold the property, and Peck became the purchaser subject to the prior incumbrances.

It is claimed that Peck purchased by agreement with Marshall to sell the lot, pay off the incumbrances, retain the price of lot 19, and pay any surplus that might remain to Marshall.

On receiving a deed from the trustee, Peck procured a release from Marshall for his equity of redemption, for which he, at the time, paid Marshall. Peck afterwards sold this property to one Valentine for $10,500. The sale was made in August, 1858. It was partly for cash and partly on time, the last payment maturing in 1864. It is claimed that all the incumbrances on this property, including the $3000 to Peck, did not exceed $8000, leaving in Peck's hands $2500 received from Valentine which belonged to Marshall.

It is claimed that appellant repeatedly demanded a conveyance from Peck to a trustee for appellant, and the payment of the surplus to her; that he acknowledged the obligation but postponed its fulfillment, making various excuses; that he also

acknowledged to other persons that he held the lot for her, but he died never having conveyed, and leaving appellees his heirs, nor did he pay her the $2500 surplus in his hands; that by his authority appellant took possession of the lot by placing a tenant thereon; that after his death she applied to his heirs for a conveyance and to pay her the $2500, which they refused; that the other heirs have conveyed the lot to F. W. Peck, and he had mortgaged it to the United States Mortgage Company.

The defendants do not deny that their father sold the lot to Marshall for $3000 on three years time, with ten per cent interest; they deny that appellant has any interest in the property; they insist the mortgage by Marshall and wife of the other property subject to incumbrances was to secure other and different indebtedness from Marshall to Peck growing out of other transactions; they deny that Peck ever agreed to convey lot 19 in trust for appellant; they admit that he purchased the other property at the trustee's sale, but they deny that it was under the agreement charged, or that he agreed to sell it and, after paying the incumbrances to pay the surplus to Marshall, or that Peck agreed to hold lot 19 in trust for appellant or to convey it to a trustee for her use; they admit the sale to Valentine, but insist he sold as absolute owner; deny that appellant ever took possession of lot 19 or expended money thereon or paid taxes. The United States Mortgage Company admit the mortgage and insist they made the loan without notice.

On a hearing in the court below the bill was dismissed, and complainant appeals.

This is a case of the character that it is not probable that we can learn the true character of the transaction. A large portion of the acts occurred over twenty years since. One of the parties to them is dead and his lips are sealed, and those succeeding to his rights do not, nor can they be expected to know much, if anything, of the transaction. After such a length of time the relation of the principal witness to com-

plainant operates to only fix in his memory facts tending to her benefit, whilst those opposed have faded out and renders his evidence of less value, however honest his purpose, than if he occupied a different relation to appellant.

Peck having died, appellant is not a competent witness. Being a party in interest, the second section of chapter 51, Rev. Stat. 1874, prohibits her from testifying. We can not, therefore, consider her testimony. Nor does she fall within the exceptions of other sections of the act.

It is urged that Marshall, the husband of appellant, has such an interest in the subject matter of the litigation as to prevent his testifying in the case. He swears the verbal agreement to convey lot 19 to his wife occurred soon after Peck gave the bond for a conveyance and long before Peck's death. Had it appeared that he only assigned the claim to render him competent, he could not have testified, as he would be precluded by the terms of the seventh section of the act. Under the first and second sections of the act he is competent. His relation of husband of complainant does not disqualify him as a witness. He is, by the fifth section, rendered competent, as the case is one in which the wife could have sued alone if she had been sole and unmarried. The relation he occupies to her only goes to his credibility, not to his competency.

The husband testifies fully to the transactions as set up in the bill, and with detail and some degree of precision. And he is corroborated in his testimony as to the bond, as Windett testified to having it in his possession and that it was destroyed by the fire of October, 1871. Smith corroborates his testimony as to Peck's agreement to convey to a trustee for the use of appellant, and Valentine swears that when he received a deed for lot one from Peck, he said he had arranged to obtain possession, as he was to convey to Mrs. Marshall a lot on Michigan avenue; but he fixes no other more definite locality. But with all this evidence we are not satisfied that there was not some other arrangement executed and carried out in the

lifetime of Peck which superseded all these contracts and agreements.

There has been great delay in bringing suit and in asking an enforcement of the claim, if any existed, against Peck in his lifetime. We regard it almost inconceivable that appellant, if there was any merits in her claim, should wait, under the most favorable theory of her case, ten years after she was entitled to a deed. And this is the more surprising when we reflect that she and her husband, a portion if not all of that time, were suffering for the want of the common necessaries of life. In 1864, in January, Marshall wrote Peck that he was "entirely destitute of means to get along with;" that the weather was extremely cold and he did not have three sticks of wood or any other fuel in his house; that his landlord was pressing for a month's rent which was due and he unable to pay; and asking for a loan of $100 to help to keep his family from distress.

If they had believed they had any well-founded claim to this property, or the surplus claimed on the sale of the homestead, why ask a loan? Why not propose to sell or otherwise dispose of that interest, if it existed, or press payment of the claim for the surplus? Nor did appellant refer to either when she wrote Peck that their furniture was distrained for rent, and she besought a loan. Persons driven to such dreadful straits would assuredly have rendered such claims available, even at a heavy sacrifice, to relieve such pressing distress, and yet neither of them refer, in the remotest degree, to either claim. According to appellant's theory, the surplus, under any contingency, was due, or nearly so, when this last letter was written. Why ask to borrow, rather than discount a portion of that claim, if it existed? We think this speaks volumes against the validity of such claims. That they should, for ten years, be pinched by biting poverty, with its terrible apprehensions, to say nothing of the distress it imposed, and hold these large claims, amounting in the aggregate almost to a fortune, seems almost incredible. That sane persons would

so act seems impossible. If such claims existed, why not assert and enforce them at once against Peck? Why wait until his death, when more than an abundance was within their reach? Men do not so act. Why press for and almost beseech loans, when Peck held $3000 worth of their real estate, and owed them $2500?

But, it may be said, Valentine's last note was not due, and the law then gave them no remedy until Peck was paid. Valentine swears he completed the payments on lot one in September, 1864, and we presume when Marshall wrote Peck on the 4th of the preceding January, Valentine could not have owed Peck $5500 on the purchase, although he did owe him a balance. It, singularly enough, nowhere appears when Valentine was to make payments. He seems not to have been asked that question. But if there was still $3000 due on that purchase, there would be in his hands the surplus, or if there was less than $3000 due on that purchase, his claim of $3000 and the prior incumbrances were paid, and he had in his hands a part of the surplus, and if the agreement was as claimed, there was no occasion to borrow money from Peck, as he would have been owing Marshall or his wife such portion of the balance as was in his hands.

We are, from all the circumstances attending the transaction, and the great delay in resorting to legal steps to enforce the claims now asserted, almost irresistibly impelled to the conviction that this old contract was, long before Peck's death, satisfactorily adjusted and canceled. The great commercial and financial revulsion of 1857, it will be remembered, greatly depressed the price of all real estate, as well in cities as in the country, and owing to this great depression, purchasers were not eager to pay up and enforce their purchases, but generally abandoned and canceled them, when they could. Men were more concerned in making a subsistence for themselves and families, than in the pursuit of fortunes by purchasing real estate, and thousands were unable to perform their contracts of purchases of real estate, and, from the evidence these letters

afford, we must conclude that Marshall was not an exception, and that he, in some manner, must have canceled this agreement.

Leaving the Statute of Frauds out of view, the loose and indefinite expressions proved to have been made to different disinterested persons do not prove such a contract as a court of equity can enforce. They neither fix price, terms, conditions, nor time of performance. These mere oral declarations, without further explanation, are too indefinite to warrant a decree for the relief sought.

In further confirmation of the theory that some arrangement had been made by which Peck had become the absolute owner, Marshall, in consideration of $200, released to Peck the homestead, after he had purchased it at the trustee's sale; and his letter to Peck, under date of March 15, 1858, in which he says to Peck that he is the owner of the property, and he supposes he will pay an interest coupon which had fallen due under one of the mortgages on the property. In this as in the other letters there is no reference to any claim complainant or her husband had on the property or its proceeds.

Again, we are unable to conceive it possible, if the arrangement claimed by appellant existed, that business men would have resorted to the mode of purchase and sale of any right Marshall may have held in lot one when he released it to Peck for the money he was paid therefor. If Peck was to sell, pay all incumbrances, including his own, and pay the surplus to Marshall, why advance money, not on the surplus that was expected, but to pay for the release? Any one would suppose that if Marshall believed he had an interest in the lot which would have depreciated the price, and prevented him from receiving a surplus, he would have been eager to release and enhance his chances of receiving a surplus, without selling such interest to Peck; nor can we understand why Peck should pay for the release, when he held, as is claimed, ample security for his lien and the prior incumbrances. He seems to have had no interest whatever in producing a surplus. That was

for Marshall's interest, and not for his. We must conclude, from this release made by Marshall for a consideration paid therefor, that it was on an arrangement by which Marshall had ceased to have any further interest, actual or prospective, in the lot. If not, it is strange the transaction took such a shape and no written memorandum of it was made.

If there was a valid claim for what is claimed as surplus, it is equally strange that no steps were taken to have it probated against the estate of Peck or that they never sued him for its recovery. It must be for the reason that the claim was without foundation, or it was considered barred by the statute. Even if its existence had been proved on the trial, we are aware of no principle or adjudged case that would bring it within the principles governing trust property. If Peck ever owed it, it could have been recovered in an action at law, as it was a debt, and no more than any other debt. If Peck received the money for the use of appellant, an action for money had and received could have been maintained by her until it was barred by the Statute of Limitations.

After much labor and pains in examining the evidence in the case, we are of opinion that the court below could not have rightfully rendered a different decree, and it must be affirmed.

*Decree affirmed.*

Mr. JUSTICE DICKEY: I do not concur in the conclusion of the court in this case.