## MALVINA HARRIMAN ET AL.
### v.
## CARLOS SAMPSON, JANE B. WAY ET AL.

*Administration—Distribution under Parol Contract—Evidence, Closely Scrutinized—Husband and Wife—Witnesses—Sec. 5, Chap. 51, R. S.*

1. Where an attempt is made to effect a distribution of the property of a deceased person different than that provided by law, by a contract resting in parol, the evidence relied upon to establish such contract is looked upon with jealousy and should be weighed in the most scrupulous manner.

2. Where the wife is disqualified to testify in her own behalf, the husband is likewise disqualified to testify for her.

3. Upon a bill filed to restrain an administrator from paying over certain money to one of the heirs of the deceased, who claims it under an alleged parol contract between herself and husband and her mother, the deceased, shortly before the mother's death, it is *held:* That the husband is an incompetent witness; and that the evidence does not establish the alleged contract.

[Opinion filed May 27, 1887.]

APPEAL from the Circuit Court of Bureau County; the Hon. GEORGE W. STIPP, Judge, presiding.

Messrs. JESSE EMERSON and ECKELS & KYLE, for appellants.

Messrs. ROBERT FARWELL and OWEN G. LOVEJOY, for Jane B. Way, appellee.

LACEY, J.   This was a bill in equity by the appellants against the appellees seeking to restrain the appellee Robert Farwell, who was administrator of the estate of Sarah B. Watts, deceased, from paying over certain money about to be collected by him in part as attorney of Jane B. Way and part as administrator of the estate of Sarah B. Watts, deceased, which he was about to collect of the debtors of said decedent, which the bill alleges belonged to the said estate and which was wrongfully claimed by said Jane B. Way, and to pay over

to said Jane B. Way, she being insolvent. The appellants claim in common with all the respondents, except the said Farwell, to be the lawful heirs of the said Sarah B. Watts, and entitled to their distributive share of said estate. The answer under oath was waived, and the bill prays that the money to be collected on the judgments aforesaid be decreed to belong to the estate. The money on the notes, one against Henry Harriman and one against Charles R. Townsend, was collected by said Farwell after the filing of the bill, as follows: Of Harriman, January 6, 1885, $1,256.85; from Townsend, March 10, 1885, $1,125, and were held by the said Farwell to abide the order of court. Upon a hearing the court found the equities with the respondents and dismissed the bill and decreed that complainants pay the costs, and assessed damages on the injunction bond in favor of Jane B. Way to the amount of $234.47.

The answer of Jane B. Way admits that the persons named in the bill are the only heirs of Sarah B. Watts, deceased; that said deceased died at her and her husband's, Benjamin Way's, residence on August 14, 1884, in Clay County, State of Kansas, and avers the deceased came to her house in the latter part of May, 1884, took sick in June, 1884, and was under medical treatment till her death, but was up and about the house till about the first part of August, 1884. She further sets up in her answer that deceased, her mother, after coming to her house, entered into an agreement with her with the assent of her husband, Benjamin Way, who was a party to the agreement, to the effect that Mrs. Watts was to give the respondent the money and the promissory notes mentioned in the bill, in consideration of which respondent and her husband were to furnish a home for Mrs. Watts with them; they were to board and lodge her, furnish her such clothing as she needed, to nurse and care for her in her sickness, to furnish medical treatment and attention, to make her as comfortable as circumstances would permit during the balance of her life and when she died have her body decently buried. That upon the making the agreement Mrs. Watts handed her the notes and money mentioned in the bill and delivered them to her.

That at the time the agreement was made the Harriman note was not in deceased's immediate possession but she soon afterward obtained it and delivered the same to her.   That the money and notes were so delivered to her with the intent to vest in her the absolute title.   Further, respondent and her husband fulfilled their part of the agreement.   That the deceased in expectation of death gave said money and promissory notes to her and delivered the same to her with the intention to vest her with the ownership, claims the money and the notes as her separate and sole property.   What is the evidence in the case to sustain this claim of appellee Jane B. Way whereby she obtains the entire estate of her mother, amounting to some $3,000?   It is sought to sustain her claim by the evidence of her husband, Benjamin Way, and her two sons, Elbert Way, twenty-three, and Newton Way, seventeen years old, who swear to the contract of purchase set up in her answer more or less circumstantially.   But before we consider the evidence we must settle the question of the competency of Benjamin Way to testify in behalf of his wife, she being incompetent because the opposite parties sue as the heirs of Sarah B. Watts, deceased.   We think he is also incompetent. The 5th Sec. of Chap. 51 on Evidence, R. S., prohibits his being a witness for his wife during marriage or after its dissolution "except in case where the litigation shall be concerning the separate property of the wife," etc., and others mentioned " *   *   * in all of which cases the husband and wife may testify for or against each other in the same manner as other parties may, under the provisions of the act."   It is insisted that under the above exception the husband may testify for the wife even where she is not allowed under the statute to testify for herself.   But the Supreme Court in passing on this section of the statute in Treleaven v. Dixon, 119 Ill. 548, November 13, 1886, held that the last clause, the words, " may testify for and against each other in the same manner as parties may under the provisions of the act," did not mean that they could testify for and against each other the same as *other persons*.   That the husband and wife must be regarded as one party and hence in case the wife was disqualified to testify in

her own behalf so was the husband. The court affirms the decisions deciding the same way in Crane v. Crane, 81 Ill. 165, and Warrick v. Hull, 102 Ill. 280, and overrules the case on this point in Marshall v. Peck, 91 Ill. 187, and all expressions in other cases where any expressions to the contrary are found. We understand that the decision is made without reference to the question of whether the husband was interested or not in the event of the suit. But if interest of the husband made any difference, it seems that Benjamin Way was interested and was a party to this contract to keep Mrs. Watts during her life and would apparently be entitled to any benefits accruing to him and his wife under it. This disposes of the testimony of Benjamin Way, and there only remains the testimony of the two boys to support the supposed contract. Elbert, the oldest of the boys, states that during the summer of 1884 he resided with his father and mother in Clay County, Kansas, and knew his grandmother, the deceased; that she lived during the last three months of her life with his father and mother; came there in May, and died August 14, 1884. "In the summer of 1884 I heard her say that she came there to make it her home with 'us' during what time she lived." "Mother and her agreed to build a room for her to the house, if she would take her and take care of her during her life, and she said she would give mother all she had for taking care of her. She spoke about the notes against Charles Townsend and one against Henry Harriman; she said she would give the notes and money to mother for taking care of her. She had six hundred dollars in money. I did not hear grandmother say how much money she had. After the agreement was made I heard grandmother say she had given the Townsend note and the money to mother and she had sent for the Harriman note. Jesse Emmerson had it for collection to give it to her. When she received the letter she handed out the note to mother. This conversation the 3d of July, 1884. I did not see the Harriman note delivered. Grandmother told me she had delivered it. The Harriman and Townsend notes and *money* were in mother's possession for some time before her death and they remained in her possession. Mother has in

her possession a little wood box that formerly belonged to Mrs. Watts. It came into her possession the last of June, 1884, and she kept it in the secretary. The box was kept locked all the time and my mother kept the key." On cross-examination he stated at the time the agreement to keep her; his father, mother and grandmother were present. The conversation in which his grandmother told him what disposition she had made of the notes was at the dinner table the very day they finished plowing corn—think it was on 28th June on Saturday. This is the substance of all his testimony bearing on this question. The boy Newton's testimony is not abstracted but is stated to be the same as the above. After the death of Mrs. Watts, the appellee, Jane B. Way, had her body embalmed and placed in a coffin and brought to Bureau County, Illinois, for burial, and met her brothers Alfred and William Watts at the depot at Buda, and the body of Mrs. Watts was buried on August 17, 1884.

Now to rebut this evidence the complainants called several witnesses to show what statement appellee, Mrs. Way, had made after Mrs. Watts' death, and introduced some of her letters written shortly before and shortly after her mother's death. First her brother, William Watts, who met her at the depot with the corpse, and who testified: "I had a conversation with her about the property; she said at that time that she found money in mother's trunk after her death. She stated there was $600 in one package and I think some $80 in another. She said she did not know that mother had but little and after her death she found it in unpacking her trunk." "This conversation was in the depot building." "Mrs. Way mentioned she did not know she had money enough to bury her with." "His brother Albert was present at the time." He is in Kansas now; this was while they were waiting for the corpse. It appears that after that they met at this witness' house to talk over the matter a week after the funeral. Harrimans, Townsends and Sampson "had some talk but I didn't pay much attention. Mrs. Way said mother had given her all she had." "I can't say that this was said at the meeting." "In the conversation at the depot Mrs. Way said mother

had left everything to her." Charles R. Townsend, husband of Pearly, daughter of deceased, Henry Harriman, Malvena, his wife, daughter of Mrs. Watts, and Pearly Townsend, all swear that at this meeting Mrs. Way stated that she found $600 in her mother's trunk after her death. Charles Sampson, son of Mrs. Watts' son by her first husband, swore that at a conversation with Mrs. Way had at Burchfields before the family meeting, she told him Mrs. Watts had given everything she had to "us." In none of their conversations did she ever claim that this property was gotten under a contract with Mrs. Watts to keep her during her lifetime. Also a letter was introduced in evidence written by Mrs. Way to her sister Helen Way, who resided in Iowa, September 8, 1884, in which she stated "mother left money in her trunk to bury her" and " mother gave me all she had when she came here and that is all that makes any trouble with them," her brothers and sisters. She also abuses Mrs. Harriman most roundly. Also a letter written from her to her half-brother, Carl Sampson, June 30, 1884, only two days after this supposed contract and before the supposed delivery of the Harriman note, in which she states that her mother was no better and that she was getting weaker every day (her mother was 78 years old), and that the doctor said there was no hope for her; she had quit taking medicine and said she would take no more; spoke of Mrs. Harriman coming there to see her mother. " Mother speaks with great love for you all," she writes. It is true Mrs. Way denies all their admissions about finding money in the trunk except what was in the letter to Helen, which was in her own handwriting, and this she tries to explain away by saying she stated that she wrote it for fear Helen would be offended if she told her how much she got. Her daughter in a measure corroborated her in regard to admissions at the meeting, swears she did not hear it and heard pretty much all the conversations. But there is still another witness by the name of William Fisher, who lived neighbor to the Ways in Kansas, and whose testimony also, on another point, Mrs. Way introduces in her own behalf, who testified that he visited at Mrs. Way's house in September, 1884, and had a conversation

with Mrs. Way in regard to the money left by Mrs. Watts, in which Mrs. Way stated there were two separate amounts of money in the box, $600 in one package and $80 dollars in another.   It was after Mrs. Watts' death she found the money. She said she did not know there was any money in the trunk till after her mother's death.   " It seems to me she said she found it in a sachel in a trunk.   She said she found it when she unpacked the trunk soon after her death;" "did not trouble the trunk till after her death."   "She said shortly before her death she pointed to her trunk and told her there it was, and all that was in it, to do as she liked with it."   Mrs. Way also denies this conversation, and her sons also swear that they heard all the conversation between their mother and Fisher and nothing of the kind was said.   This was the substance of about all the competent evidence in the case upon this point and upon it the court found the issues for the respondent, Jane B. Way.   The evidence shows that Mrs. Watts was an old lady, being seventy-eight years of age, and that she had been living around among her different children, and that she had just lived with one of her daughters some eight months prior to going to Mrs. Way's; that she was never there before, so far as the evidence shows; that she appeared to have no special preference for Mrs. Way more than the rest of her children; that when she went to Mrs. Way's home she was in a very feeble condition and Mrs. Way found out too, according to her own letter before this supposed agreement was fully consummated, that there was no hope for her mother; that she would soon die.   Such a contract as is claimed would seem unconscionable under the circumstances, and such as ought not to be made, and the consideration for the money small indeed.   The only evidence to sustain the answer is the interested evidence of her own two sons.   And this rests on their testimony as to the delivery of the notes and on alleged admissions of Mrs. Watts at the dinner table in their presence. They swear their mother had possession of the money and notes after that till the death of their grandmother and ever after.   The evidence of Mrs. Way's admissions at different times and places that she did not know her mother had any

such sum of money till after her death, when she found it in her trunk, is to our mind convincing. It would be unreasonable to believe that so many witnesses would swear falsely to this matter; and besides, that she stated to her sister Helen in her letter that her mother " left money in her trunk to bury her," is not denied, but she claims that it was a false statement to deceive her sister. If this admission had not appeared under her own signature it may well be judged that she would have denied making it, as she did all the other statements sworn to by witnesses to the same effect. And there is Fisher's evidence, who swears to the same admissions made soon after the death of Mrs. Watts, made in Kansas at her own house, which is strongly corroborative of what the other witnesses swear to. He is a disinterested witness, and has also been given credit by Mrs. Way by introducing his testimony in her behalf on another matter. His evidence is positive and his memory clear as to what Mrs. Way said. We must believe that he swore to the truth, notwithstanding she denies it, and in spite of the evidence of her sons, who testify that they heard all the conversation between Fisher and their mother, and no such conversation took place. There was certainly some portion of it that escaped their attention. These admissions having been proven against her denial under oath, establishes the fact that she has testified falsely in her own behalf, and that what she admitted under so many different circumstances and at so many different times and places is true as a matter of fact, i. e., that she did not know that her mother had the $680 till after her death, when she found it in her trunk when she unpacked it. This, then, convicts the two sons of falsehood in swearing they heard their grandmother say that she delivered this money to their mother, and that their mother had this money in her possession at the time of her mother's death; and having been convicted of this falsehood, and considering their relationship to Mrs. Way, their entire evidence is unreliable and unworthy of credit, as to either contract or delivery of the notes, and the fact of their posses-sion by the mother at the time of Mrs. Watts' death. And the untruthfulness of their evidence is further established by the

fact that at different times when Mrs. Way was called to account by the interested parties about Mrs. Watts effects, she never claimed the existence of the contract set up in the answer for the notes and money, nor in her letter to her sister Helen, but claimed that her mother *gave her* all she had. We are inclined to think and must hold that all the evidence introduced by Mrs. Way to show the contract set up in her answer is entirely overcome, and that Mrs. Watts died the owner and possessor of the notes, money and effects mentioned in the bill.   In Woods v. Evans, 113 Ill. 186, it is distinctly laid down as well settled principle of law that " it is a well settled doctrine, where an attempt is made to effect a distribution of property different from that provided by law, by a contract resting in parol, the evidence relied upon to establish such a contract is looked upon with jealousy and should be weighed in the most scrupulous manner." Under the circumstances of this case, Mrs. Watts having died at the house of Mrs. Way, distant from all her other children, among strangers, and only surrounded by her one daughter and her immediate family, possessed of all her personal effects, what a favorable opportunity is offered Mrs. Way, if she was so disposed, to claim everything by virtue of such a contract as is here claimed, or by some other device, and to establish such claim by her sons. Who can contradict or gainsay what they might testify to ? Therefore the necessity of watching such testimony with caution and jealousy. All the facts, surrounding circumstances and evidence considered, we are of the opinion that the equities in this cause should, by the court below, have been found with the complainants, and the relief asked granted. The decree of the court below is therefore reversed and the cause remanded, with directions to the court below to find the issues and equities in favor of complainant and to grant the relief prayed for, and to refer the case to the master to state an account.

*Decree reversed and cause remanded with directions.*